No. 25-1574

# In the United States Court of Appeals for the Fourth Circuit

BETHANY M. HALL,

*Plaintiff-Appellant,*

*v.*

A. SCOTT FLEMING, IN HIS OFFICIAL CAPACITY AS DIRECTOR OF THE
STATE COUNCIL OF HIGHER EDUCATION FOR VIRGINIA,

*Defendant-Appellee.*

On Appeal from the United States District Court
for the Eastern District of Virginia, Richmond Div.,
No. 3:25-cv-00186-DJN

## APPELLANT'S OPENING BRIEF

Steven W. Fitschen
   (Counsel of Record)
James A. Davids
The National Legal Foundation
524 Johnstown Road
Chesapeake, Va 23322
(757) 463-6133
sfitschen@nationallegalfoundation.org
jdavids@nationallegalfoundation.org

Frederick W. Claybrook, Jr.
Claybrook LLC
13536 Montvale Dr.
Silver Springs, MD 20904
(301) 622-0360
rick@claybrooklaw.com

UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT

## DISCLOSURE STATEMENT

- In civil, agency, bankruptcy, and mandamus cases, a disclosure statement must be filed by **all** parties, with the following exceptions: (1) the United States is not required to file a disclosure statement; (2) an indigent party is not required to file a disclosure statement; and (3) a state or local government is not required to file a disclosure statement in pro se cases. (All parties to the action in the district court are considered parties to a mandamus case.)
- In criminal and post-conviction cases, a corporate defendant must file a disclosure statement.
- In criminal cases, the United States must file a disclosure statement if there was an organizational victim of the alleged criminal activity. (See question 7.)
- Any corporate amicus curiae must file a disclosure statement.
- Counsel has a continuing duty to update the disclosure statement.


No. <u>25-1574</u>        Caption: <u>Hall v. Fleming</u>

Pursuant to FRAP 26.1 and Local Rule 26.1,

<u>Bethany M. Hall</u>
(name of party/amicus)

_____

 who is _____appellant_____, makes the following disclosure:
(appellant/appellee/petitioner/respondent/amicus/intervenor)


1.    Is party/amicus a publicly held corporation or other publicly held entity?  ☐YES ☑NO


2.    Does party/amicus have any parent corporations?              ☐YES ☑NO
      If yes, identify all parent corporations, including all generations of parent corporations:




3.    Is 10% or more of the stock of a party/amicus owned by a publicly held corporation or other publicly held entity?                                    ☐YES ☑NO
      If yes, identify all such owners:

4.  Is there any other publicly held corporation or other publicly held entity that has a direct
    financial interest in the outcome of the litigation?                    ☐YES ☑NO
    If yes, identify entity and nature of interest:

5.  Is party a trade association? (amici curiae do not complete this question)    ☐YES ☑NO
    If yes, identify any publicly held member whose stock or equity value could be affected
    substantially by the outcome of the proceeding or whose claims the trade association is
    pursuing in a representative capacity, or state that there is no such member:

6.  Does this case arise out of a bankruptcy proceeding?                    ☐YES ☑NO
    If yes, the debtor, the trustee, or the appellant (if neither the debtor nor the trustee is a
    party) must list (1) the members of any creditors' committee, (2) each debtor (if not in the
    caption), and (3) if a debtor is a corporation, the parent corporation and any publicly held
    corporation that owns 10% or more of the stock of the debtor.

7.  Is this a criminal case in which there was an organizational victim?     ☐YES ☑NO
    If yes, the United States, absent good cause shown, must list (1) each organizational
    victim of the criminal activity and (2) if an organizational victim is a corporation, the
    parent corporation and any publicly held corporation that owns 10% or more of the stock
    of victim, to the extent that information can be obtained through due diligence.

Signature: s/Steven W. Fitschen                     Date:        July 1, 2025

Counsel for: Bethany M. Hall

- 2 -

Print to PDF for Filing

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................. ii

JURISDICTIONAL STATEMENT ....................................................1

STATEMENT OF THE ISSUES .........................................................1

STATEMENT OF THE CASE............................................................2

SUMMARY OF THE ARGUMENT ...................................................4

ARGUMENT .....................................................................................5

I.      Virginia's Denial of a VTAG Scholarship to Bethany Because of Her Religious Beliefs Violates the Supreme Court's Free Exercise Jurisprudence in *Carson, Espinoza,* and *Trinity Lutheran*................................................................6

II.     *Locke* Has Been Abrogated by the Cases Discussed Above .....................10

ADDENDUM ....................................................................................22

# TABLE OF AUTHORITIES

## Cases

*Carson v. Makin,* 596 U.S. 767 (2022) .....................................4-9, 11-12, 14-16, 18

*Church of Lukumi Babalu Aye, Inc. v. Hialeh*, 508 US. 520 (1993)................... 9-10

*Elrod v. Burns*, 427 U.S. 347 (1976).........................................................................17

*Espinoza v. Mont. Dept. of Rev.*, 591 U.S. 464 (2020) ..............4-9, 11-12, 14-16, 18

*Everson v. Board of Ed. of Ewing*, 330 U.S. 1 (1947) ..............................................7

*Fulton v. Phila.,* 593 U.S. 522 (2021) ......................................................................17

*Groff v. DeJoy*, 600 U.S. 447 (2023) ......................................................................15

*Kennedy v. Bremerton*, 597 U.S. 507 (2022) ..................................................... 15-16

*Lemon vs. Kurtzman*, 403 U.S. 602 (1971)......................................................15, 18

*Locke v. Davey*, 540 U.S. 712 (2004) ...................................................2, 4-5, 10-19

*Lyng v. Northwest Indian Cemetery Protective Assn.,*
    485 U.S. 439 (1988)...................................................................................7

*McDaniel v. Paty*, 435 U.S. 618 (1978)...................................................................9

*Rodriguez de Quijas v. Shearson/Am. Express, Inc.,*
    490 U.S. 477, 484 (1989) ................................................................ 4-5, 15

*Roman Catholic Diocese of Brooklyn v. Cuomo,* 592 U.S. 14 (2020)....................17

*Sherbert v. Verner*, 374 U.S. 398 (1963)..................................................................7

*Trinity Lutheran Church of Colombia vs. Comer,*
    582 U.S. 449 (2017)..............................................................4-8, 11-15,17-18

*Venkatraman v. REI Sys., Inc.*, 417 F. 3d 418 (4th Cir. 2005) ...................................6

*Zelman v. Simmons-Harris*, 536 U.S. 649 (2002)......................................................9

**Statutes**

28 U.S.C. § 1291 ...............................................................................................1

28 U.S.C. § 1331 ...............................................................................................1

28 U.S.C. § 1343 ...............................................................................................1

42 U.S.C. § 1983 ...........................................................................................1, 3

Virginia Code Annotated §§ 23.1-628, *et seq.* ................................................1, 3, 8

**Regulations**

8 Virginia Administrative Code 40-71-10, *et seq.* ..................................................1

**Other Authorities**

L. Jorgenson, The State and the Non-Public School, 1825-1925 (1987) ..........13, 18

Douglas Laycock, *Theology Scholarships, the Pledge of Allegiance,*
*and Religious Liberty: Avoiding the Extremes but Missing the Liberty*,
118 Harv. L. Rev. 155 (2004) ......................................................................17

M. McConell, *et al.*, Religion and the Constitution (4th ed. 2016)........................13

## JURISDICTIONAL STATEMENT

Plaintiff-Appellant Bethany M. Hall filed this action on March 7, 2025, in the United States District Court for the Eastern District of Virginia, Richmond Division, via 42 U.S.C. § 1983, alleging violation of the Free Exercise Clause of the First Amendment of the United States Constitution. JA6-7. Thus, the district court had jurisdiction under 28 U.S.C. §§ 1331 and 1343. The district court dismissed the action under Rule 12(b)(6) in a memorandum opinion, on May 9, 2025, noting in its Conclusion that the Order is "final and appealable." JA46.

Plaintiff timely filed a notice of appeal on May 16, 2025. JA47. This Court has jurisdiction over this appeal pursuant to 28 U.S.C. § 1291.

## STATEMENT OF THE ISSUES

This case's focus is the Virginia Tuition Assistant Grant Program, Virginia Code Annotated §§ 23.1-628, *et seq.*, and its accompanying regulations, 8 Virginia Administrative Code 40-71-10, *et seq.*, that offer a generally available scholarship to Virginia college students, but expressly excludes those who seek to study topics that the state deems too religious.[1] Ms. Hall, whose scholarship was withdrawn

---

[1] Here and hereafter, "too religious" is shorthand for the manner in which the Virginia Tuition Grant Program (hereafter "VTAG" or "VTAG program), more fully described below, makes available tuition assistance to all students who attend "nonprofit private institutions of higher education whose primary purpose is to provide collegiate, graduate, or professional education and not provide *religious training or theological education.*" Va. Code Ann. § 23.1-628 (emphasis added).

when she changed her major from secular music to a major considered too religious—which determination was repeatedly enforced when she changed her major two more times, each time being told her major was too religious—brings the following issues to this Court:

1. Did the District Court err in determining Virginia can deny a generally available scholarship based solely upon the religious nature of the scholarship recipient's chosen major?

2. Did the District Court err in holding that *Locke v. Davey*, 540 U.S. 712 (2004), remains controlling law?

## STATEMENT OF THE CASE

Appellant Bethany Hall ("Bethany") is a Virginia resident and full-time student at Liberty University who just completed her sophomore year.  JA7.  She is a devout Christian who wishes to devote her life to sharing her faith through music and worship with young people.  JA11-12.  When she was admitted to Liberty in 2023, Bethany applied for the VTAG program grant, under which Virginia undergraduate students attending nonprofit private colleges and universities can receive a scholarship worth $5,000 per school year.  JA11.   Bethany's declared major at that time was "Music Education: Choral," and Liberty notified Bethany that she qualified for the full VTAG Program grant.  JA11.

Soon thereafter, Bethany heard God's call to ministry and changed her major

to "Youth Ministries." JA11-12. Virginia Code Annotated § 23.1-628 limits eligibility for VTAG grants to "nonprofit institutions of higher education whose primary purpose is to provide collegiate, graduate, or professional education and not provide religious training or theological education." JA8-10. The VTAG program is administered by the Director of the State Council of Higher Education for Virginia ("SCHEV"), and Appellee A. Scott Fleming is the Director of SCHEV. JA 7-8.

In compliance with the Virginia Code, Virginia Code Annotated §§ 23.1-628, *et seq*, and the relevant regulations cited above, and pursuant to SCHEV's administration thereof, Liberty's financial aid office informed Bethany that, due to her changed major, she was no longer eligible for a VTAG grant because her major was too religious. JA11-12. In August of 2023, Bethany changed her major to "Christian Leadership and Church Ministries." In October of 2023, Bethany once again changed her major, this time to "Music & Worship" with a focus on "Youth Ministries." With each of these changes, Liberty continued to deny Bethany a VTAG Program scholarship because those majors were too religious. JA12.

Bethany sued A. Scott Fleming in his official capacity as Director of SCHEV on March 7, 2024, under 42 U.S.C. § 1983, for violation of the Free Exercise Clause of United States Constitution. JA6-8 Defendant moved to dismiss Bethany's Complaint for failure to state a claim upon which relief can be granted

JA19, and the District Court granted Defendant's motion on May 9, 2025. JA46.

In so doing, the District Court relied upon *Locke v. Davey*, 540 U.S. 712 (2004),

concluding that *Locke* "remains binding Supreme Court precedent and the Court

lacks the authority to overrule such precedent." JA41-45. For this conclusion, the

District Court cited *Rodriguez de Quijas v. Shearson/Am. Express, Inc.,* 490 U.S.

477, 484 (1989), which states that lower courts "should follow the case which

directly controls, leaving to the Court the prerogative of overruling its own

decisions." JA45.

## SUMMARY OF THE ARGUMENT

The core meaning of the First Amendment's Free Exercise Clause is that

Americans have the right to worship God as they see fit and not be penalized by

the government for doing so. In three recent decisions, *Carson v. Makin,* 596 U.S.

767, 778 (2022); *Espinoza v. Mont. Dept. of Rev.*, 591 U.S. 464, 475 (2020); and

*Trinity Lutheran Church of Colombia vs. Comer*, 582 U.S. 449, 466 (2017), the

Supreme Court emphasized that the Free Exercise Clause prohibits a state actor

from denying generally available benefits to individuals solely due to their

religious beliefs and practices. This case, which—as described above—involves a

Virginia statute and the related regulations that provide a government benefit to all

qualifying students *except* those like Bethany who wish to pursue a course of study

that is too religious, fits precisely within the rule of *Carson*, *Espinoza*, and *Trinity*

*Lutheran*.

However, as the District Court noted in dismissing this case, the Supreme Court's decision in *Locke v. Davey* cuts the other way. In *Locke*, the Supreme Court improperly narrowed the Free Exercise Clause and permitted Washington State to deny a generally available public scholarship to those who attend college for the purpose of studying religious ministry. 540 U.S. at 724. While the Supreme Court in *Carson, Espinoza*, and *Trinity Lutheran* distinguished, rather than explicitly overruled, *Locke*, the rationales of those cases undermined *Locke's basic* teaching and cabined its conclusions of law and its holding to the narrow points in which each of those cases specifically aligned with *Locke*. Beyond those contexts, *Locke* is no more. Although, as just acknowledged, this Court, like the District Court, is bound by *Rodriguez de Quijas's* admonition (lower courts "should follow the case which directly controls, leaving to the Court the prerogative of overruling its own decisions"), were it free to do so, this Court should acknowledge that *Locke* has been functionally abrogated. Therefore, Bethany argues that, to ensure that Virginia students with religious ministry majors can use state-provided benefits generally available to others, this Court should no longer follow *Locke*, but the Supreme Court's later-decided cases.

## ARGUMENT

This Court reviews a grant of a motion to dismiss under FRCP 12(b) (6) *de*

*novo*, indulging all reasonable factual inferences in the non-movant's favor.

*Venkatraman v. REI Sys., Inc*., 417 F. 3d 418, 420 (4th Cir. 2005).

## II. Virginia's Denial of a VTAG Scholarship to Bethany Because of Her Religious Beliefs Violates the Supreme Court's Free Exercise Jurisprudence in *Carson, Espinoza,* and *Trinity Lutheran*

The First Amendment to the United States Constitution provides that "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof." In a trio of recent cases, the Supreme Court has reiterated that discriminating against persons because of their faith by "disqualifying them from a public benefit solely because of their religious character" is "odious to our Constitution." *Carson,* 596 U.S. at 778; *Espinoza.*, 591 U.S. at 475; *Trinity Lutheran*, 582 U.S. at 466. It is undisputed that the Commonwealth of Virginia has denied Bethany access to the VTAG Program solely because of her religious beliefs and practice. Thus, it must be struck down as unconstitutional.

*Carson*, the most recent decision of the three, is instructive here. In *Carson*, Maine decided to offer children and their parents in districts without public schools the right to designate a school of their choosing—public or private—and the state would defray part of the tuition costs of the chosen school. 596 U.S. at 773-74. However, by statute Maine excluded from the program schools that had a religious "faith or belief system" and taught "through the lens of this faith." *Id.* at 775.

In holding the Maine statute unconstitutional, the Supreme Court outlined two important principles, both of which are applicable to this case. First, the Court specified that the Free Exercise Clause not only protects against outright restrictions on religious faith, but also prohibits "indirect coercion or penalties on the free exercise of religion." *Id.* at 778 (quoting *Lyng v. Northwest Indian Cemetery Protective Assn.,* 485 U.S. 439, 450 (1988)). Next, the Court stated that, when a state excludes "religious observers from otherwise available public benefits," it violates the Free Exercise Clause. *Id.* (citing *Sherbert v. Verner*, 374 U.S. 398, 404 (1963) and *Everson v. Board of Ed. of Ewing*, 330 U.S. 1, 16 (1947)). Since Maine offered its citizens a benefit (private school tuition) but withheld this generally available benefit from religious schools "solely because of their religious character" and practice, the program penalized the free exercise of religion. *Carson,* 596 U.S. at 780 (quoting *Trinity Lutheran,* 582 U.S. at 462).

Similarly, in *Espinoza,* the Supreme Court evaluated a Montana law that provided tuition assistance to parents who send their children to private schools. *Espinoza,* 591 U.S. at 468-69. The legislature directed that the program bar funding for "any sectarian purpose," as provided in Montana's constitution. *Id.* at 469. The Court concluded that the Montana law violated the Free Exercise Clause because it singled out religious people and institutions for negative treatment under this program. *Id.* at 475. Because of this discriminatory treatment, the Court applied

7

strict scrutiny, and Montana failed to show it had a compelling state interest. *Id.* at 484-86.

Bethany is in the same situation as the plaintiffs in *Carson* and *Espinoza.* The controlling statute states that grants under the VTAG Program "shall be used only for undergraduate, graduate, or professional collegiate work in educational programs *other than those providing religious training or theological education*." Va. Code Ann. § 23.1-631(C) (emphasis added). When she was first accepted into Liberty and indicated that her chosen major was secular "Music Education: Choral," Bethany was awarded a VTAG Program grant. JA11. However, when she changed her major to "Youth Ministries," her VTAG Program grant was revoked. JA11-12. Bethany changed her major twice more, first to "Christian Leadership and Church Ministries," and second to "Music & Worship" with a focus on "Youth Ministries." Each time the grant was again denied for choosing a major that was too religious. JA12. The inherent religious discrimination inherent in the VTAG program is most dramatically demonstrated by the different treatment of the two music majors: a secular music major is eligible; a religious major is not. In so discriminating, Virginia presented Bethany with a stark choice—she "may participate in an otherwise available benefit program or remain a religious [person]." *Trinity Lutheran,* 582 U.S. at 450. This is an improper coercion of her free exercise. *Carson*, *Espinoza*, and *Trinity Lutheran* forbid it, unless the

religious studies exception of the VTAG Program can withstand strict scrutiny. *Id.*; *Carson*, 596 U.S. at 780; *Espinoza*, 591 U.S. at 484.

In order to satisfy strict scrutiny, Virginia's statutory exception for religious ministry studies "'must advance "interests of the highest order" and must be narrowly tailored in pursuit of those interests.'" *Carson*, 596 U.S. at 780 (quoting *Church of Lukumi Babalu Aye, Inc. v. Hialeh*, 508 US. 520, 546 (1993) (in turn quoting *McDaniel v. Paty*, 435 U.S. 618, 628 (1978) (plurality opinion)). "A law that targets religious conduct for distinctive treatment . . . will survive strict scrutiny only in rare cases." *Lukumi*, 508 U.S. at 546. The VTAG Program is not one of these rare cases.

Establishment concerns are insufficient to counter this free exercise violation. A neutral benefit program that includes religious people or institutions does not violate the Establishment Clause. *Carson*, 596 U.S. at 780*; Zelman v. Simmons-Harris*, 536 U.S. 649–653 (2002). And a decision by any state to separate church and state "more fiercely" than the federal Constitution "cannot qualify as compelling in the face of a free exercise claim." *Carson*, 596 U.S. at 781 (quotations and cites omitted). Simply put, "A State's antiestablishment interest does not justify enactments that exclude some members of the community from an otherwise generally available public benefit because of their religious exercise." *Id.* The situation is exactly what is happening here—Virginia's VTAG

Program cannot meet strict scrutiny, and its religious ministries carveout must fall.

## III. *Locke* Has Been Abrogated by the Cases Discussed Above

Bethany acknowledges that the Supreme Court's decision in *Locke* appears on point in this matter. There, the Supreme Court let stand a Washington State program that offered scholarships to undergraduate students who met certain academic and other criteria, but excluded students pursuing a ministerial degree in devotional theology. *Id.* at 715. However, *Locke* is inconsistent with the later Supreme Court decisions just discussed and has been effectively abrogated by them.

In *Locke,* the Court started with the premise that Washington State could have permitted students pursuing a devotional degree to participate in the program. *Id.* at 719. But the Court went on to conclude that the decision to exclude the plaintiff from the scholarship program did not violate the Constitution, citing three grounds. First, it invoked the "play in the joints" rubric, under which "there are some state actions permitted by the Establishment Clause but not required by the Free Exercise Clause." *Id.* at 718-19. Second, the Court concluded that the law did not fall within *Lukumi*, where the Court had explained that statutes that are not facially neutral with respect to religion were presumptively unconstitutional. *Id*. at 720. To reach this surprising conclusion, the Court found that a law that literally disfavored students based on their choice

of a religious degree was facially neutral because it "imposes neither criminal nor civil sanctions" on a religious service and "does not require students to choose between their religious beliefs and receiving a government benefit." *Id.* The Court asserted that any alleged disfavoring of religion by the state was of a "mild" variety unworthy of significant concern. *Id.* Third, the *Locke* Court found that "most states" during the founding era sought to avoid establishment concerns by "formal prohibitions against using tax funds to support the ministry." *Id.* at 723. In conclusion, the Court found that, "if any room exits between the two Religion Clauses, it must be here." *Id.* at 725.

The dissenting justices in *Locke* attacked the majority opinion for reasons that the Court later adopted in *Trinity Lutheran*, *Espinoza*, and *Carson.* The dissenting justices agreed with the majority that Washington created a "generally available public benefit" in the form of a public scholarship and then excluded only one category of students—those who were studying theology. But the dissenting justices correctly understood that that was enough for the program to violate the Free Exercise Clause. *Id.* at 726 (Scalia, J., dissenting). The dissent attacked the majority's "play in the joints" theory as not only lacking a principled basis, but also inapplicable because there was in fact no potential conflict between the Free Exercise and Establishment Clauses. *Id.* at 728. The dissenters also noted that the majority's rationales for allowing explicit religious discrimination

were unpersuasive. First, any direct, facial contravention of a constitutional provision "can never be dismissed as insubstantial." *Id.* at 731. And second, any supposedly "purehearted" legislative motive for the religious exclusion is insufficient because good intentions cannot "excuse statutes that facially discriminate." *Id.* at 733.

The *Locke* dissenters' criticisms have been adopted as majority rationales in more recent cases. The Court has effectively distinguished *Locke* into oblivion. Alternatively—as noted above, *supra*, p. 2—*Loc*ke's holding has been cabined to fact pattern like those present in *Carson*, *Espinoza*, and *Trinty Lutheran*, but not present in the instant case.

The Court's undermining of *Locke* began in *Trinity Lutheran*, in which the Court considered a Missouri policy of excluding religious institutions from a generally available program subsidizing playground surface areas. The Court held the anti-religious exclusion unconstitutional. It distinguished *Locke* with the statement that "there is no dispute that Trinity Lutheran is put to the choice between being a church and receiving a government benefit. The rule is simple: No churches need apply." 582 U.S. at 465. How this was effectively different from what the Court said in *Locke*—"No religious studies students need apply"— the Court did not explain. The Court continued to erode *Locke* in *Espinoza*, in which the Court distinguished *Locke* in two ways. First, it concluded that, unlike

*Locke*, which only disqualified a narrow category of potential beneficiaries, Montana barred "all aid to a religious school 'simply because of what it is,' putting the school to a choice between being religious or receiving government benefits." *Id.* at 480 (citing *Trinity Lutheran*, 582 U.S. at 464). The Court also criticized Montana for putting families "to a choice between sending their children to a religious school or receiving such benefits." *Id.* Then, the Court compared the "'historic and substantial' state interest in not funding the training of clergy" in *Locke* to Montana's decision to disqualify religious schools as a group from government aid. *Id.* The Court reviewed the history of government support for education in the founding era and found:

- "In the founding era and the early 19th century, governments provided financial support to private schools, including denominational ones. 'Far from prohibiting such support, the early state constitutions and statutes actively encouraged this policy.'" *Id.* (citing L. Jorgenson, The State and the Non-Public School, 1825-1925, at 4 (1987)).

- "Local governments provided grants to private schools, including religious ones, for the education of the poor." *Id.* at 480-81 (citing M. McConell, *et al.*, Religion and the Constitution 318-19 (4th ed. 2016).

- "Even States with bans on government-supported clergy . . . provided various forms of aid to religious schools." *Id.*

13

The effect of these statements and historical review by the Court significantly undermined *Locke*'s rationale. As the *Espinoza* Court stated, all that remained of *Locke* was permitting states to disallow funding of "state-supported clergy." *Id.* at 483. Again left unexplained was why this remained permissible after the Court's historical discussion.

In *Carson*, the Court closed the circle begun in *Trinity Lutheran* and *Espinoza* by addressing religious practice, as well as status. It concluded that *Locke* did not save a state law that disallowed funding of religious schools that seriously applied their faith to the curriculum, permeating all the courses with religion. *Id.* at 789. It limited *Locke* to the "narrow focus" of "vocational religious degrees" that enable a student "to prepare for the ministry," once again noting that *Locke* does not permit "the State to exclude religious persons from the enjoyment of a public benefits on the basis of their anticipated religious use of the benefits." *Id.* at 789. How education for "vocational religious degrees" is different from education for "anticipated religious use" was not explained. While even this narrowed view of *Locke* could be construed to cover Bethany, because her "Music and Worship" major can be used as preparation for religious ministry, the combined rationales of *Trinity Lutheran*, *Carson*, and *Espinoza* demonstrate that, in fact, *Locke* has been abrogated by the Supreme Court, even while it has purported to distinguish it.

The best analogy to *Locke*'s current position is found in the history of *Lemon vs. Kurtzman*, 403 U.S. 602 (1971). In *Lemon,* the Court attempted to construct a "grand unified theory" for assessing Establishment Clause claims. *Kennedy v. Bremerton*, 597 U.S. 507, 534 (2022). While the Supreme Court generally holds that its decisions should be followed by lower courts until the Court itself overrules them, *Rodriguez de Quijas,* 490 U.S. at 484, the Court in subsequent decisions had so limited and undermined *Lemon* that it had effectively distinguished it into oblivion. *Kennedy*, 597 U.S. at 534. In *Kennedy*, the Court criticized the district court and the Ninth Circuit for failing to realize that *Lemon,* while not formally overruled (and not formally overruled in *Kennedy*, either), had "long ago" been "abandoned" by the Court. *Id*. After *Kennedy*, the Court has referred to *Lemon* as "abrogated." *See Groff v. DeJoy*, 600 U.S. 447, 459 (2023).

As in *Lemon*, the Court in *Trinity Lutheran, Espinoza,* and *Carson* "long ago . . . abandoned" *Locke*'s three-part rationale under which it had justified religious discrimination against those studying for vocational ministry. *Kennedy* itself adds to the interment of the *Locke* rationales. First, all discussion of an alleged "play in the joints" between the Free Exercise and Establishment Clauses upon which the *Locke* Court explicitly relied, 540 U.S. 718-19, has been jettisoned. Instead, the Court explained in *Kennedy* that the First Amendment's Religion Clauses have "complementary purposes" and "not warring ones where one clause is always sure

to prevail over the other." *Kennedy*, 596 U.S. at 533. The Court went on to dismiss "phantom" Establishment concerns based on "perceptions" or "discomfort" against anyone who "partakes of the religious," holding that such concerns will not justify Free Exercise discrimination. *Id.* at 535, 543. Especially when the Court has held that permitting a religious person to take advantage of a generally available benefit does not "offend the Establishment Clause," there is no "play in the joints" analysis to be done. *See Carson*, 596 U.S. at 781.

Second, *Carson* outlines that a government decision to fund all schools except religious ones "is discrimination against religion." *Id.* Regardless of the state's perceived concerns or "purehearted" motive, the bottom line is this: "A state's antiestablishment interest does not justify enactments that exclude some members of the community from an otherwise generally available public benefit program because of their free exercise." *Id.* With respect to the history of state support of schools and religion, *Carson* approvingly cited *Espinoza*, which outlined the many ways in which, *contra Locke*, the text, history, and tradition of the First Amendment permits religious schools and persons to gain the benefits of generally applicable programs. *See Carson*, 596 U.S. at 780; *Espinoza*, 591 U.S. at 480-81.

Finally, the Court since *Locke* has given short shrift to government contentions that a burden on the free exercise of religion can be "too light" to

16

justify First Amendment protection. In *Carson*, the Court instructed that "the Free Exercise Clause of the First Amendment protects against indirect coercion or penalties on the free exercise of religion, not just outright prohibitions." 596 U.S. at 778 (cleaned up); *see also Fulton v. Phila.,* 593 U.S. 522, 532 (2021) ("[R]eligious beliefs need not be acceptable, logical, consistent, or comprehensible to others in order to merit First Amendment protection."); *Trinity Lutheran*, 582 U.S. at 463; *see generally* Douglas Laycock, *Theology Scholarships, the Pledge of Allegiance, and Religious Liberty: Avoiding the Extremes but Missing the Liberty*, 118 Harv. L. Rev. 155, 172 (2004). Of course, the assertion that the loss of a substantial scholarship is "too light" for constitutional consideration was an inherently suspect claim from the outset. As Justice Scalia noted in his *Locke* dissent,

> The indignity of being singled out for special burdens on the basis of one's religious calling is so profound that the concrete harm produced can never be dismissed as insubstantial. . . . The First Amendment, after all, guarantees *free* exercise of religion, and when the State exacts a financial penalty of almost $3,000 for religious exercise— whether by tax or by forfeiture of an otherwise available benefit — religious practice is anything *but* free.

*See* 540 U.S. at 731 (Scalia, J., dissenting); *see also Roman Catholic Diocese of Brooklyn v. Cuomo,* 592 U.S. 14, 19 (2020) ("The loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury.") (quoting *Elrod v. Burns,* 427 U.S. 347, 373 (1976) (plurality opinion)).

Taken together, all of these decisions have undermined and limited *Locke* to the point that it, like *Lemon*, has been effectively abrogated.

If *Locke* were not a bar to Bethany's claim, then the application of controlling law would be straightforward. As in the K-12 context, a review of the founding era evidences "the same blending of state and denominational resources was present in the founding and support of early colleges." Jorgenson, The State and the Non-Public School, 1825-1925, at 4. In fact, the joinder of secular and sacred in state college funding was so significant that "whether they should be thought of as state colleges or as church colleges is a problem in semantics that is perhaps best resolved by calling them state-church colleges." *Id.*

Virginia's VTAG Program is undoubtedly a generally available program. When Bethany elected a secular "Music Education" major, she was approved for the VTAG Program. Only when she changed to majors considered too religious was her scholarship withdrawn. Virginia's reason was simple—the religious ministries focus of the majors disqualified them. Under *Trinity Lutheran*, *Espinoza*, and *Carson*, this sort of outright religious discrimination is "odious" to the Free Exercise Clause of the Constitution. Like the three statutes invalidated in *Trinity Lutheran*, *Espinoza*, and *Carson*, the VTAG Program directly punishes Bethany's free exercise of religion because she decided to pursue a religious ministry education. This violates the Free Exercise Clause.

Only the archaic and unpersuasive *Locke* precedent can save the VTAG Program and deny Bethany her rightful scholarship. If this Court feels compelled to apply *Locke* despite the Supreme Court undermining it repeatedly in later cases, then this Court should express its own hope that the Supreme Court will review this case and make clear that *Locke* is no longer good law.

## CONCLUSION

Virginia's VTAG Program intentionally and explicitly discriminates against the free exercise of religion. This intentional discrimination is odious to the First Amendment. *Locke* should be overruled, and this Court should reverse the district court's opinion.


Respectfully submitted,

s/ Steven W. Fitschen
Steven W. Fitschen
     Counsel of Record
James A. Davids
The National Legal Foundation
524 Johnston Road
Chesapeake, Va. 23322
(757) 463-6133
sfitchen@nationallegalfoundation.org
jdavids@nationallegalfoundation.org

Frederick W. Claybrook, Jr.
Claybrook LLC
655 Fifteenth St., NW, Ste. 425
Washington, D.C. 20005
(301) 622-0360
rick@claybrooklaw.com

**CERTIFICATE OF COMPLIANCE**

I certify that this brief complies with the type-volume limitations of

F.R.A.P. 32(a)7(B)(i) and F.R.A.P. 29(a)(5). Exclusive of the exempted portions,

this brief contains 4,323 words, including footnotes, in 14-point Times New

Roman font.  This total was calculated with the Word Count function of Microsoft

Office Word 365.


s/ Steven W. Fitschen
Steven W. Fitschen
The National Legal Foundation
524 Johnstown Road
Chesapeake, Va. 23322
(757) 650-9210
sfitschen@nationallegalfoundation.org

**CERTIFICATE OF SERVICE**

I hereby certify that on July 1, 2025, I served the foregoing Opening Brief

of the Appellant on all counsel through the CM/ECF system. I certify that all

participants in the case are registered CM/ECF users.


s/ Steven W. Fitschen
Steven W. Fitschen
The National Legal Foundation
524 Johnstown Road
Chesapeake, Va. 23322
(757) 650-9210
sfitschen@nationallegalfoundation.org

<u>**Statute and Regulation Addendum**</u>

<u>*Statutes* **(in order of appearance)**</u>

- <u>**42 U.S.C. § 1983**</u>
  Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress, except that in any action brought against a judicial officer for an act or omission taken in such officer's judicial capacity, injunctive relief shall not be granted unless a declaratory decree was violated or declaratory relief was unavailable. For the purposes of this section, any Act of Congress applicable exclusively to the District of Columbia shall be considered to be a statute of the District of Columbia.

- <u>**28 U.S.C. § 1331**</u>
  The district courts shall have original jurisdiction of all civil actions arising under the Constitution, laws, or treaties of the United States.

- <u>**28 U.S.C. § 1343**</u>
  (a) The district courts shall have original jurisdiction of any civil action authorized by law to be commenced by any person:
  (1) To recover damages for injury to his person or property, or because of the deprivation of any right or privilege of a citizen of the United States, by any act done in furtherance of any conspiracy mentioned in section 1985 of Title 42;
  (2) To recover damages from any person who fails to prevent or to aid in preventing any wrongs mentioned in section 1985 of Title 42 which he had knowledge were about to occur and power to prevent;
  (3) To redress the deprivation, under color of any State law, statute, ordinance, regulation, custom or usage, of any right, privilege or immunity secured by the Constitution of the United States or by any Act of Congress providing for equal rights of citizens or of all persons within the jurisdiction of the United States;

(4) To recover damages or to secure equitable or other relief under any Act of Congress providing for the protection of civil rights, including the right to vote.

(b) For purposes of this section—

(1) the District of Columbia shall be considered to be a State; and

(2) any Act of Congress applicable exclusively to the District of Columbia shall be considered to be a statute of the District of Columbia

- **28 U.S.C. § 1291**

  The courts of appeals (other than the United States Court of Appeals for the Federal Circuit) shall have jurisdiction of appeals from all final decisions of the district courts of the United States, the United States District Court for the District of the Canal Zone, the District Court of Guam, and the District Court of the Virgin Islands, except where a direct review may be had in the Supreme Court. The jurisdiction of the United States Court of Appeals for the Federal Circuit shall be limited to the jurisdiction described in sections 1292(c) and (d) and 1295 of this title.

- **Virginia Code Annotated (VCA) § 23.1-628**

  A. As used in this article, unless the context requires a different meaning:

  "Eligible institution" means a nonprofit private institution of higher education whose primary purpose is to provide collegiate, graduate, or professional education and not to provide religious training or theological education.

  "Grant" means a Tuition Assistance Grant.

  "Principal place of business" means the single state in which the natural persons who establish policy for the direction, control, and coordination of the operations of the institution as a whole primarily exercise that function, considering the following factors: (i) the state in which the primary executive and administrative offices of the institution are located; (ii) the state in which the principal office of the chief executive officer of the institution is located; (iii) the state in which the board of trustees or similar governing board of the institution conducts a majority of its meetings; and (iv) the state from which the overall operations of the institution are directed.

  "Program" means the Tuition Assistance Grant Program.

  B. From such funds as may be provided for such purpose, the Tuition Assistance Grant Program is established to provide Tuition Assistance Grants to or on behalf of Virginia students who attend eligible institutions.

C. Eligible institutions admitted to this program on or after January 1, 2011, shall (i) be formed, chartered, established, or incorporated within the Commonwealth; (ii) have their principal place of business within the Commonwealth; (iii) conduct their primary educational activity within the Commonwealth; and (iv) be accredited by a nationally recognized regional accrediting agency.

## VCA § 23.1-629.

The Council is designated as the administering agency for the Program and may adopt regulations consistent with this article and appropriate to the administration of the Program. The Council may define by regulation such terms used in this article as "full-time," "undergraduate," "graduate," "professional," and "financial aid."

## VCA § 23.1-631.

A. Virginia students who are obligated to pay tuition as full-time undergraduate, graduate, or professional students at an eligible institution are eligible to receive a grant for the academic year for which they enroll.

B. Eligibility for grants under the Program is limited to a total of four academic years for undergraduate students, pharmacy students, and medical students and a total of three academic years for other graduate students and professional school students. The academic years for which grants are awarded need not be in succession.

C. Grants under the Program shall be used only for undergraduate, graduate, or professional collegiate work in educational programs other than those providing religious training or theological education.

## VCA § 23.1-634.

Each eligible institution acting as an agent for students receiving grants under the Program shall promptly credit disbursed funds to student accounts following the institution's verification of student eligibility and expeditiously distribute any refunds due recipients.

### *Regulation*

- **8 Virginia Administrative Code 40-71-10**

The following words and terms when used in this chapter shall have the following meanings unless the context clearly indicates otherwise:

"Academic year" means the enrollment period that normally extends from late August to May or early June and that is normally comprised of two semesters 15 to 16 weeks in length or three quarters 10 to 11 weeks in length.

"Accredited" means approved to confer degrees pursuant to the provisions of Article 3 (§ 23.1-213 et seq.) of Chapter 2 of Title 23.1 of the Code of Virginia and requirements of the annual appropriation act, as the same are now constituted or hereafter amended. Unless otherwise provided by law, an institution must be accredited by a nationally recognized regional accrediting agency prior to participation in the program.

"Award" means a grant of Virginia Tuition Assistance Grant Program funds given during fall and spring terms at semester institutions and fall, winter, and spring terms at quarter institutions.

"Census date" means the time during a term when a count of enrolled students is made for reporting purposes. For all standard terms, the census date shall be the end of the program add/drop period. For nonstandard terms, the census date shall be determined by council on a program by program basis.

"Cost of attendance" means the sum of tuition, fees, room, board, books, supplies, and other education-related expenses, as determined by an eligible institution for purposes of calculating a student's financial need and awarding federal student aid funds.

"Council" or "SCHEV" means the State Council of Higher Education for Virginia or its designated staff.

"Domiciliary resident" means a student who is determined by the enrolling institution to be a domiciliary resident of Virginia under § 23.1-502 of the Code of Virginia and augmented by the Domicile Guidelines or provided the equivalent educational benefits of the same under § 23.1-505 or 23.1-505.1 of the Code of Virginia. In cases where there are disputes between students and the enrolling institutions, the council shall make the final determinations (see 8VAC40-71-40 E).

"Eligible institution" means private nonprofit institutions of collegiate education in the Commonwealth whose primary purpose is to provide collegiate, graduate, or professional education and not to provide religious training or theological education. Eligible institutions not admitted to this program before January 1, 2011, shall also:

1. Be formed, chartered, established, or incorporated within the Commonwealth;

2. Have their principal place of business within the Commonwealth;

3. Conduct their primary educational activity within the Commonwealth;

4. Be accredited by a nationally recognized regional accrediting agency; and

5. Comply with applicable reporting requirements as:

a. Found in the Code of Virginia or supporting administrative code for institutions operating in Virginia or participating in state financial aid programs; or

b. Identified by the council as necessary for the administration of the program.

"Eligible program" means a curriculum of courses at the undergraduate, graduate, or first professional level for those institutions eligible under the definition of eligible institution. For those institutions chartered under an act of Congress and admitted to this program prior to January 1, 2011, only a curriculum of courses offered at a campus located in the Commonwealth are eligible programs.

1. Undergraduate programs are those programs that lead to an associate's or baccalaureate degree and that require at least two academic years (minimum 60 semester hours or its equivalent in quarter hours) to complete or an undergraduate teacher certification program.

2. Graduate programs are those programs leading to a degree higher in level than the baccalaureate degree and that require at least one academic year (minimum 30 semester hours or its equivalent in quarter hours) to complete. Only graduate programs in a health-related professional program classified

in the National Center for Education Statistics' Classification of Instructional Programs (CIP) Code 51-series programs are eligible graduate programs.

3. First-professional programs are those post-undergraduate programs leading to a degree in dentistry, medicine, veterinary medicine, or pharmacy. Only professional programs in a health-related professional program classified as CIP Code 51-series programs are eligible first-professional programs.

4. Programs that provide religious training or theological education, classified as CIP Code 39-series programs, are not eligible programs.

5. Students enrolled in a declared double-major that includes an ineligible degree program may receive an award only for those terms in which the student's enrollment includes an equal or greater number of courses required for an eligible major or concentration than the number of courses enrolled for an ineligible major or concentration (excludes general education or elective courses). Exceptions may be made by council based on circumstances beyond the control of the student.

"First-professional student" means a student enrolled and program placed in any of the following post-undergraduate programs: dentistry, medicine, veterinary medicine, or pharmacy.

"Fiscal year" means the period extending from July 1 to June 30.

"Formed, chartered, established, or incorporated within the Commonwealth" means the institution is, and continues to be, recognized as a domestic or in-state institution under the council's certification to operate in Virginia and under state law.

"Full-time student" means a student who is enrolled for at least 12 credit hours per semester or its equivalent in quarter hours at the undergraduate level or nine credit hours per semester or its equivalent in quarter hours at the graduate or first-professional level. The total hours counted do not include courses taken for audit, but may include required developmental, remedial, or prerequisite courses and other elective for-credit courses that normally are not counted toward a degree at the institution. For students enrolled in:

1. Nonstandard terms: the full-time enrollment requirement, as approved by council, will be proportionate based on the length of the terms, the number of contact hours, or other measures of comparability with the institution's normal academic year.

2. Concurrent undergraduate, graduate, or first-professional courses: the full-time enrollment requirement may be met by a combination of the total credit hours, providing that the combination totals at least the minimum credit hours for full-time status, as described above, for the student's institutionally recognized student level.

3. Programs leading to a doctoral degree: the full-time enrollment requirement may be met by enrollment in nine credit hours per semester or its equivalent in quarter hours or the minimum full-time enrollment as defined by the institution, whichever is less.

"Graduate student" means a student enrolled and program-placed in a master's or doctoral program.

"Nonprofit institution" means an educational institution operated by one or more nonprofit corporations, and said institution's earnings are applied solely to the support of said institution and its educational programs and activities.

"Nonstandard degree program" means a degree program where the terms of the program do not conform to the standard terms of the institution's academic year. Nonstandard programs must be approved by council before students enrolled in the programs can receive awards.

"Participating eligible institution" means an eligible institution that has been approved to participate in the program by council.

"Principle place of business" means the single state in which the natural persons who establish policy for the direction, control, and coordination of the operations of the institution as a whole primarily exercise that function considering the following factors:

1. The state in which the primary executive and administrative offices of the institution are located. The primary executive and administrative offices are those most often physically used in the performance of the executive and administrative functions of the institution;

2. The state in which the principal office of the chief executive officer of the institution is located. The principal office of the chief executive officer is the location that is most often physically occupied by the chief executive officer when in performance of official institution duties;

3. The state in which the board of trustees or similar governing person or persons of the institution conducts a majority of its meetings; and

4. The state from which the overall operations of the institution are directed in that the institution is not subject to control or directives from an office, agency, or board located within another state.

"Program" means the Virginia Tuition Assistance Grant Program.

"Term" means the fall semester or quarter, winter quarter, or the spring semester or quarter.

"Undergraduate student" means a student in a program leading to an associate's or baccalaureate degree or a student enrolled in an undergraduate teacher certification program.

"VTAG" means the Virginia Tuition Assistance Grant.